## Anderson v. Sandy Valley & Elkhorn Railway Company.

(Decided October 26, 1916.)

### Appeal from Letcher Circuit Court.

1. Reformation of Instruments—Written Contracts—Evidence.—A . complainant who asks that a part of the stipulations of a written contract be permitted to stand, and a part to be altered, or stricken out, must produce stronger proof than is required from one who disowns the contract in its entirety on the ground of fraud or undue influence.

2. Reformation of Instruments—Written Contracts—Evidence.—A court of equity will not decree the alteration in the terms of a duly executed written contract on the ground of fraud or mistake, unless the proofs are full, clear and decisive; a mere preponderance of evidence is not enough.

3. Appeal and Error—Failure to Index Record—Fees.—Where a clerk fails to index the record as required by rule V, subsection 6, of court, the record will be condemned and the clerk will be prohibited from collecting his fees therefor.

DAVID H. HAYS and J. P. HOBSON & SON for appellant.

BAILEY P. WOOTTON, MORGAN & HARVIE, HAGER & STEWART, JESSE MORGAN and LEWIS E. HARVIE for appellee

OPINION OF THE COURT BY CHIEF JUSTICE MILLER— Affirming.

The appellant Reuben Anderson, owned a farm of thirty acres on Elkhorn Creek, in Letcher county, and about one mile from the city of Jenkins. About six acres of it were level; the remainder was hilly and broken.

The appellee, the Sandy Valley & Elkhorn Railway Co. (hereinafter called the railway company for brevity), was organized for the purpose of constructing a railroad from the mouth of Shelby Creek, in Pike county, to a point near the head of Elkhorn Creek, in the adjoining county of Letcher, a distance of about thirty-five miles.

On August 27th, 1902, and in consideration of the sum of $130.00 then paid, and $132.50 to be paid in ninety days thereafter, Anderson and wife sold, and agreed to convey to the appellee a strip of land through his farm, described as follows:

"A right of way for a single or double track railway, extending through the limits of our farm, which is bounded on the north by William Ison, bounded on the east by John Adams, bounded on the south by Sam Ison, bounded on the west by Sam Ison.

"Beginning at Station 121+42.8 and running up Elkhorn Creek to Station 127+110 to the upper end of said described farm a distance of 590 ft. and a width of 100 ft. and 50 ft. from center line and containing about 1½ acres. It is understood that there is to be no crops interfered with or garden or orchard until grantor Anderson has reasonable time to remove said orchard, &c. It is

further agreed that said Anderson has the right to fence said line on the premises and also to cultivate up to track provided it does not interfere or obstruct the track or line. It is agreed that the company remove a crib at their expense.

"The said right of way to be of a width of not less than one hundred 100 feet, and such additional width as may be necessary for cuts and fills."

On the back of the contract there is this endorsement:

"If the dwelling house of Anderson has to be removed it is to be removed from off the line at expense of R. R. Co. or any building he has it shall be removed from off the line."

The railway company then located the proposed right of way by clearing it and driving stakes along the center line thereof. It will be noticed, however, that the description in the contract did not specifically locate the right of way; it merely contracted for a right of way through the farm, having a width of 100 feet and a length of 590 feet, and running to the upper end of the farm.

On November 22nd following, Anderson and wife completed their contract by executing and delivering to the railway company a deed which contained a description of the right of way and provisions concerning it, reading as follows:

"A right of way for a single or double track railway, extending through the limits of our farm, which is bounded on the north by the lands of William Ison; on the east by the lands of John Adams; on the south by the lands of Sam Ison; on the west by the lands of Sam Ison.

"The said right of way to be one hundred (100) feet wide, and of such additional width as may be necessary for cuts and fills. This deed intends to and does convey said above described right of way where same is now located on said land, or as same may hereafter be located.

"It is understood and agreed that if it is necessary to remove the dwelling house of said Anderson from said right of way the said railway company is to pay the expenses therefor, and remove same; also any other buildings now on said land which it may be necessary to be moved.

"It is understood and agreed that said Anderson has the right to cultivate up to the track provided it in no way interferes with or obstructs said railway company."

The remaining $132.50 of the purchase money was paid to Anderson, and the deed was delivered to the railway company and lodged for record on November 29th, 1902, in the Letcher county court clerk's office.

It will be noticed that the deed describes the right of way therein conveyed to be as it was then located on said land, "or as same may hereafter be located."

Nothing was done toward building the railroad until about June, 1911, when the railway company began grading its right of way upon a location somewhat different from the right of way that had been tentatively located at the time the contract was made, in 1902. Thereupon, on July 25th, 1911, Anderson filed this suit for trespass, asking a judgment for $3,000.00 for the land actually taken by the railway company in relocating the right of way, and for the further sum of $1,000.00 damages to the remaining portion of his land, resulting to it from the taking and conversion of the right of way. He did not then offer to reform the contract, or to return the purchase money and rescind the contract.

The railway company answered traversing the material allegations of the petition, and alleging that it took possession of the strip of land described in the petition under and by virtue of its deed, and not otherwise.

The right of way as described in the contract of August 27th, 1902, contained one acre and a half. By an amended answer, the railway company specifically described the right of way as actually used by it and which, according to the survey, contained 2.51 acres.

In his reply the plaintiff, for the first time, alleged fraud, by saying that the deed did not describe the land sold to the railway company, and that the words "or as same may hereafter be located," had been inserted in the deed by the fraud of the defendant and its agents.

It is further alleged in the reply that at the time Anderson signed the deed, the railway company and its agents falsely and fraudulently represented to him that the deed embraced the boundary, and only the boundary, named in the preliminary contract of August 27th, and that he did not discover the fraud in said deed until

about June 15th, 1911, which was about six weeks before this suit was instituted, and fully three months before the charge of fraud was made. The reply prays for a correction of the deed; that defendant's rights thereunder be forfeited; and, for judgment as asked in the petition.

The rejoinder traversed the allegations of fraud; and, by his amended rejoinder, which was traversed of record, the defendant interposed the five years statute of limitation, alleging by way of specification, that the deed had been delivered by the plaintiff and recorded in 1902 in the Letcher county court clerk's office, and that plaintiff had not brought his action until July 1911, which was more than eight years after the deed had been delivered and recorded.

Upon the issues thus made, the case was transferred to the equity docket; and, upon a trial thereof the chancellor dismissed the petition. Anderson appeals.

Appellee insists that its plea of limitation was sustained by the proof and was sufficient to justify the judgment of the chancellor under the authority of Brown v. Brown, 91 Ky. 639, and similar cases, holding that in order to maintain an action for relief for fraud, the plaintiff must allege and prove that he discovered the fraud or mistake within five years next before the bringing of the action, and that he could not, by the exercise of reasonable diligence, have discovered it sooner; and, that the deed being of record, the law imputed notice to him.

On the other hand, appellant insists that limitation is not available, because Anderson remained in possession of the land until the new right of way was taken in the Summer of 1911; that the new right of way was not located within a reasonable time after the contract and deed were executed; and finally, that if the company had the right to make another location after eight years, it should pay for the additional acre then taken.

Under our view of the merits of the case, however, we do not consider it necessary to discuss these subordinate questions; for, if the plaintiff has failed by his proof to authorize a reformation of the deed, it must stand, as written.

At the time the deed was written in 1902, Anderson was 36 years old, and describes himself as a farmer, merchant, blacksmith and carpenter. He was then a constable, and formerly had been a magistrate. We

mention this to show that Anderson, by reason of his age and experience, was a man of more than average intelligence, and in the full possession of his powers.

Anderson testified that he agreed with N. T. Hopkins as to the terms of the contract; that G. B. Vaughn took plaintiff's acknowledgment to the written contract of August 27th, 1902, and that Monroe Bentley, a deputy county court clerk took his acknowledgment to the deed executed in November, 1902; that he did not read the deed because he had sore eyes; that Bentley first offered Anderson the deed for him to read; that Anderson told Bentley it hurt his eyes to read, and asked Bentley if the deed was written according to the contract; that Bentley said it was, and he then read some of it to Anderson; that the part of the deed which Bentley read to him contained the same stipulations that the contract contained; but that he did not read that portion which recited that "this deed intends to, and does convey said above described right of way where same is now located on said land, or as same may hereafter be located."

Anderson testified that his wife, his brother Ben Anderson, Sam Vanover, Ben Wright, Sarah Wright, Monroe Bentley, and perhaps Grant Vanover, were present when the deed was executed.

Ben Anderson, appellant's brother, testified that he was present when Reuben executed the deed; that Reuben had sore eyes; that in reading the deed to Reuben, Bentley read some of it but did not read the "new clause" referring to the future location of the right of way. He further testified that there had been a marked advance in the price of lands in that neighborhood since 1902, and that Reuben's thirty acres of land were now worth seven or eight thousand dollars, and that the right of way strip taken by the railway company was worth $3,000.00, and that his brother had been incidentally damaged to the extent of $1,000.00.

Neither Ben Wright nor his wife testified; and, although Sam Vanover and Grant Vanover testified, neither of them said anything about Bentley, or any one, having read or failed to read the deed to Reuben Anderson. The Vanovers testified only as to land values, and damages; and Bentley contradicted Anderson.

It appears, therefore, that appellant is corroborated only by his brother, Ben Anderson.

On the other hand, Daniel Roberts, a deputy county court clerk for Pike county, testified that he was present when Anderson and his wife signed and acknowledged the deed for the right of way; that A. E. Auxier, the attorney who drew the deed, and G. B. Vaughn were also present on that occasion; that Anderson and Vaughn had quite a discussion over the deed; that the discussion related to the "new clause" above referred to, which conveyed the right of way as then located, "or where it may hereafter be located." Roberts says Anderson claimed that the company might, under that right, run the road through his house, or something like that, and wanted to know if he could recover damages in case his house should be so damaged; and that finally, to satisfy him, Mr. Auxier inserted the clause in the deed making the railway company pay the expense of removing Anderson's house or anything else that had to be moved off of the right of way. Roberts says the discussion of the "new clause" led to the insertion of the clause requiring the company to pay the expense of the removal.

A. E. Auxier, an attorney of Pikeville, represented the appellee in preparing the deeds for the right of way. He testified that he prepared a great many deeds for the appellee in connection with this right of way; that he had no recollection, independent of the deed itself, as to the circumstances attending the execution of it; that he wrote the Anderson deed; that most of it was written in his office on a typewriter, and part was written by him with pen and ink; that all the deeds which he wrote for the right of way contained the "new clause" as to the future location of the right of way, and that the two clauses in the deed relating to the company's paying the expense of removing Anderson's houses and the other permitting Anderson to cultivate up to the railroad track, were in his handwriting and were written by him at the time the deed was executed. He further refers to the fact that the deed as written conveyed a right of way; that it did not convey any particular land, and that all the deeds were so written.

Bentley, the deputy clerk who took Anderson's acknowledgment, testified that there was a discussion in which Anderson and his wife claimed that the railroad would be too close to their house and did not want to sign the deed on that account; that they claimed it would do them damage by running through their

orchard; and, that they were afraid the trains would run over their children and kill them. He says that Vaughn read the deed first; that Reuben Anderson asked Vaughn to let him read the deed; and, that Anderson read the deed before he acknowledged it.

Bentley says there was another dispute about the clause which stated that the Company should have eighty feet or more, if necessary, for making cuts and fills; that Anderson wanted that clause cut out and a specific statement of the width of the right of way inserted. Bentley also contradicts Anderson, by saying that Vaughn read the deed first and that Anderson afterwards read it before he acknowledged it.

While Vaughn does not remember whether he was present when the deed was executed, he does remember having a conversation with Anderson when they were contracting about the right of way, and says that Anderson and his wife objected to signing the contract because it placed the right of way too near their residence.

Vaughn did a great deal of work in connection with procuring the right of way; and, while he does not remember whether he was present when the Anderson deed was executed as testified to by Bentley, he says he always read the deeds to the grantors and let any one else read them that wanted to, and that if he was present on that occasion he certainly read the deed in full to Anderson.

This constitutes all the testimony upon the subject of the fraud claimed by Anderson to have been practiced upon him and his wife.

In addition, it appears from many witnesses that all the land in the neighborhood, including appellant's land, has enormously enhanced in value since the contract was made. Appellant is sustained by no witness except his brother, Ben Anderson; while he is contradicted by Roberts, Auxier, Bentley and Vaughn, all disinterested witnesses.

It is elementary that the reformation of a written contract, which is the highest and most solemn evidence of the agreement of the parties, upon the ground of fraud practiced in its execution, will not be granted, unless the proof of the fraud is clear and definite; and, that a complainant who asks that a part of the stipulations be permitted to stand, and a part to be altered, or stricken out, must produce stronger proof than is re-

quired from one who disowns the contract in its entirety on the ground of fraud or undue influence.

In no case will a court of equity decree an alteration in the terms of a duly executed written contract for fraud or mistake unless the proofs are full, clear and decisive; a mere preponderance of evidence is not enough. Royer Wheel Co. v. Miller, 20 Ky. L. R. 1831, 50 S. W. 62; Coleman v. Illinois Life Ins. Co., 26 Ky. L. R. 900, 82 S. W. 616; Ison v. Sanders, 163 Ky. 610; Southard v. Curley, 134 N. Y. 148, and the cases there cited as to the amount of proof required to authorize the reformation of a written instrument on the ground of mistake or fraud. See also Pomeroy's Eq. Jur., 3rd ed., sec. 859.

The courts have stated the rule as to the degree of evidence required for the reformation of a contract in many different ways; but, however the rule may be expressed, the evidence must be sufficiently cogent to thoroughly satisfy the mind of the court that fraud has been committed. The proof here does not rise to that dignity; on the contrary, the weight of it rebuts the charge of fraud.

The record is condemned for the failure of the clerk to index the names of the witnesess, as required by subsection 6 of Rule V. of Court, and, the clerk who made the record is prohibited from collecting his fees therefor. Rule V., Subsec. 8.

Judgment affirmed.