## Central Life Insurance Company v. Robinson.

(Decided October 4, 1918.)

### Appeal from Garrard Circuit Court.

1. Insurance—Reformation of Contract for.—A policy of insurance may be reformed, so as to express the contract between the parties, where it fails to embrace the contract, either by the mutual mistake of the parties, or by the fraud of one, and the mistake of the other, as a reformation may be made of the written testimonial of any other contract.

2. Contracts—Rectification of Terms of Contract.—The evidence, to justify a rectification of the terms of the written memorial of a contract must in all cases, be very clear and convincing.

JOE ROBINSON, H. V. McCHESNEY and SCOTT & HAMILTON for appellant.

EMMET PURYEAR and LEWIS L. WALKER for appellee.

OPINION OF THE COURT BY JUDGE HURT—Reversing.

Curtis Austin Robinson, who was then the sheriff of Garrard county, made application to the appellee, Central Life Insurance Company, to insure his life. The application was made on the 30th day of September, 1914. The application described the policy, which was desired, as a "terminal endowment, 20 pay life, payable 20 installments," and the sum for which he desired his life insured was $5,000.00. The terms "payable 20 ins.," as we understand, means that the amount of the policy, if in force, at the death of the insured, would be paid to the beneficiary in twenty equal annual installments. The application, however, contained among other provisions, the following:

"4th. If the company is not willing to issue a policy on the plan applied for, it is authorized to issue upon this application such policy of insurance as it may deem to be proper, by change of plan or amount, increase of premium, lien, or limitation of benefits, rating up age, or by installment payments commutable and or non-commutable, or some form of sub-standard policy, I reserving the right, however, to accept or decline any such policy upon presentation. My acceptance of any policy shall be a ratification by me of its terms, premium or premiums and conditions." Upon reference of the application to the medical director of the insurance company, he recommended that "a policy of $5,000.00 upon the terminable endowment, twenty pay life, payable in twenty installments, with lien of 25 per cent for three years" be issued and offered to the applicant. This recommendation was approved by R. L. Gregory, who was the secretary of the company, by an endorsement on it as follows: .

"Issue policy 25% lien for three years, 9-17-14. R. L. Gregory."

The proof shows, without any contradiction, that the policy was then attempted to be made out, by those employees of the company, whose duty it was to prepare the policies, in accordance with the application and directions of the medical director and secretary, and was enclosed in an envelope and sent by mail to Robinson, at his home in Lancaster. When the application was signed by Robinson, the agent of the insurance company delivered to him a receipt, which stated, that the company had received from him the sum of $54.20,

which was offered as the "first annual premium on policy of life insurance for five thousand dollars, to be payable, if issued, in accordance with the terms, conditions and provisions of this binding receipt, the application bearing this binding receipt number and the policy that may be issued on said application." The evidence shows, that when the company declined to issue a policy upon the plans and terms, as applied for, but issued one upon another plan, and with conditions different from the one applied for, when the policy issued was sent by mail to the applicant, a letter was written to him explaining and calling attention to the difference in the policy applied for and the one issued. Accompanying the policy issued to Robinson, a letter signed by the registrar of the company was sent, which merely said: "Enclosed you will find your policy No. 1135 for $5,000.00 life insurance in this company." A receipt was also enclosed, which the insured was requested to date and sign in the presence of a witness, and return to the company. The receipt, which was dated and subscribed by the insured, in the presence of a witness, who attested his signature, was as follows: "Sept. 25, 1914. Received of the Central Life Insurance Company policy No. 1135. Amount, $5,000.00. Plan terminal endowment 20 pay 20 inst. S. S. lien 25% for three years. Photographic copy of my application and statements to medical examiner attached, which I have carefully examined and find satisfactory, and hereby accept said policy. Also duplicate amendment on examination dated Sept. 11. 1914.

"Curtis A. Robinson."

The term 25% lien, used in the negotiations, is explained by the witnesses for the company, to mean, that, if the death of the insured should occur, in the years to which the lien is applied, that it reduces the installments to be paid under the policy 25%, or in other words, that it reduces the amount of the insurance 25%. The policy issued insured the life of Robinson in the sum of five thousand dollars, to be paid, if in force, at the death of the insured, in twenty equal annual installments of $250.00 each. The first three years, were called term insurance, and the premium for the first year was to be $54.20, for the second and third years, each, $165.75, and thereafter the insurance was terminal endowment and the premium was $229.60 for each year, until

twenty annual premiums of the latter sum should be paid. The face of the policy contained the following statement: "The typewritten sub-standard clause on the second page hereof was written in before the policy was signed." The sub-standard clause provided, that, if the insured should die within the first year, that the company should pay only 25% of the installments payable under the policy; if death should occur during the second year, the company would pay "50% of the commuted value named in the commuted value clause on this page," or, if the installments had not been commuted, in accordance with the commuted value clause, it would pay 50% of the installments; and if death occurred within the third year, the company would pay 75% of either the commuted value or the installments, as the case might be, and after the third year no deduction should be made. The reason given for the provisions of the sub-standard clause was the risk on account of the occupation of the insured, that of being a sheriff. A little less than three months after the delivery of the policy to the insured, he died. The policy was found after his death in a drawer in his office, along with a lot of other papers of no value, and other policies of insurance and other papers of value belonging to him were found in a box, which he sometimes kept in the safe in his office, and at other times in a bank vault.

This action was instituted by the beneficiary of the policy, who, by her petition and a good many amended petitions, taken together, charged that the contract between the insurance company and the insured was that it was to insure his life for the sum of five thousand dollars, all payable at one time, upon his death, with such conditions, only, as are usual in the case of an ordinary life insurance policy, but, that the insurance company, either fraudulently or by mistake, inserted the "sub-standard" clause in the policy, against the consent of the insured and without his knowledge, and likewise so drafted the policy, as to make the insurance provided for in it payable in twenty equal annual installments, and fraudulently concealed from the insured the above insertions and agreements of the policy and fraudulently represented to him that it was in accordance with the alleged contract, and procured him by such fraudulent representations to accept it, believing that

the policy was in accordance with his contract, and thereby prevented him from ascertaining the true conditions of the policy as issued, and prayed for a reformation of the policy, so as to make it express the contract as entered into between him and the company, and for a judgment for the recovery of the sum of five thousand dollars. The appellant, company, traversed all of the allegations of the petition and amended petitions. The action was brought in ordinary, but was afterward transferred to the equity side of the docket, and after hearing such evidence as was offered, the court rendered a judgment to the effect, that the contract stated in the policy be reformed so as to be as claimed by the appellee, and further adjudged, that she recover of appellant, company, the sum of five thousand dollars, with interest at 6% per annum from January 1, 1915, until paid. From the judgment the receiver of the company has appealed.

A policy of insurance may be reformed so as to express the real contract between the parties, where it fails to embrace the contract, either by the mutual mistake of the parties, or the fraud of one and the mistake of the other, as a reformation may be made of any other written memorial of a contract. The evidence, however, to warrant a rectification of the terms of the written memorial of a contract must be, in all cases, very clear and convincing. The insured is dead, and the testimony of the agent, who negotiated with him is not in the record. Springfield T. & M. Ins. Co. v. Snowden, 173 Ky. 664, 25 Cyc. 738; Anderson v. S. V. & E. Ry. Co., 171 Ky. 740; Royer Wheel Co. v. Miller, 20 R. 1831; Coleman v. Illinois Life Insurance Co., 26 R. 900; Ison v. Saunders, 163 Ky. 610. A court of equity may reform the written evidence of a contract, so as to conform to the contract, as made by the parties, but it is powerless to make a contract for the parties, or to put into it a stipuuation which the parties did not mutually assent to. When, in the instant case, it is sought to ascertain the contract made between the appellant, company, and the insured, there is no evidence of any kind as to what the contract was, except what appears in the written negotiations of the parties. We find no evidence to support the contention, that the contract was, such a one as is usually embraced in an ordinary life insurance policy,

or that it was not to have features as a "twenty pay life, payable in twenty installments," plan. The written application of the insured requested the issual of a policy with such features. It is true, it was attempted to be proven that the words "20 pay life, payable 20 ins.," in the application were not there, when signed by the insured, but were inserted afterwards. This evidence, however, amounted only to an expression of opinion by the witnesses that the words were written, when the pen had less ink upon it than when certain other words, in the application were written, and amounts to nothing, as evidence to prove that the words were inserted after the application was signed. An examination of the original application shows indisputably that the words assailed are in the same handwriting of the other written words, in the application, and there is not the slightest evidence of any interpolation. The receipt given by the insured, when the policy was delivered to him on September 25th, contains the same words in typewriting. The policy contains clauses fixing the plan of the policy in accordance with the application and receipt, as far as relates to it being a "20 pay life, payable 20 installments," policy. There was an attempt made to prove that the words "Also duplicate amendment on examination dated Sept. 11, 1914," was inserted after the receipt for the policy had been subscribed by the insured, because, as it was insisted, the typewriting appeared to have been written on the top of the signature. An examination of the original receipt, however, does not sustain this contention. According to the terms of the application, the company was authorized to issue a policy, upon a different plan from the one set out in the application, and which when offered to the applicant for the policy, he had a right to decline to accept, and hence the contract was not consummated, until the acceptance by the applicant of the policy offered. It was then and not until then, that the minds of the contracting parties met in agreement, and then the contract of insurance was made. The policy issued was not altogether in accordance with the plan of the policy applied for. In addition to its being a policy upon the "Terminal endowment, 20 pay life, payable 20 installments" plan, as applied for, it contained the "sub-standard" feature, and a clause limiting the liability of the company to 25%

of the installments, if death should occur within the first year, to 50% if death should occur within the second year, and to 75% of the liability, named in the policy, if the death should occur within the third year, but should be the full $5,000.00 if death should occur after the third year. The premium required for the first year was $54.20; the second and third years $165.25 each, and for each of the years thereafter for twenty years, $229.60. The fact, that the premium, which accompanied the application was the exact amount of the first premium, to be paid, under the plan upon which the policy was issued, would seem to indicate that a policy upon that plan was in contemplation when the application was made. The receipt evidencing the acceptance of the policy by the insured, indisputably shows, that the "sub-standard" feature was contained in the policy, and although the receipt was prepared by the insurance company, it gave notice to the insured of the existence of the "sub-standard" feature, in the policy, which was submitted to him for his acceptance or rejection. If he accepted it, he was requested to execute the receipt. The execution and return of the receipt was the notice to the company of the consummation of the contract, and that it had created a liability upon itself in accordance with the contract, as stated in the policy. He executed and returned the receipt, taking the policy into his possession, as his property, and it can not be considered in any other way, except that he was holding it as a valid contract made with the company. The evidence does, however, very clearly show that the company intended to offer to Robinson a policy containing the contract as written, except in regard to the amount of the reduction, that should be made in the insurance to be paid, if the insured should die within one of first three years after the policy was issued. The recommendation of the medical director, and the directions of the secretary were that the policy to be issued was to be upon the "terminal endowment, 20 pay life, payable in 20 installments" plan, and containing the "sub-standard" clause providing for a "lien" or reduction of the amount of insurance to be paid of 25% if death should occur within three years. The receipt to be signed by the insured, showing his acceptance of the policy described the policy, as containing a "sub-stand-

ard" clause to the same effect. This receipt was prepared by the company and transmitted with the policy to the insured. Evidently, by mistake of the draftsman of the policy, in preparing it, the "sub-standard" clause was so written, that the reduction in the amount of insurance to be paid, if the insured should die within the first year, was 75% instead of 25%, and if the insured should die within the second year the reduction was 50% instead of 25%. The insured, when he signed the receipt by which he accepted the policy, believed that he was accepting the policy in accordance with the description given in the receipt, which was that the "sub-standard" clause provided for a reduction of 25% in the amount of the insurance, if he should die within the first three years, and such policy was the one he accepted. The minds of the contracting parties thus met in agreement that the "sub-standard" lien upon the policy was to be only 25% for the first three years, instead of as it was written in the policy. Thus, both parties were mutually mistaken as to the stipulations contained in the policy, regarding the reduction to be made in the event of death within the first three years, but were agreed as to the contract. It does not seem that the insured, knowing the other provisions of the policy to be in accordance with the application, and the representation made by the company to him in the receipt as to the provisions of the "sub-standard" clause, should be held to be so negligent in failing to discover the difference between those provisions in the policy and the contract, considering the time it was in his possession, that he should forfeit his rights under the contract, which he had made for the insurance, which was that the reduction should be only 25% in the event of his death within the first three years. Hence we are of the opinion, that the court was in error in adjudging a reformation of the policy, so as to make it express a contract for insurance, as an ordinary life insurance policy, and adjudging to the appellee a recovery of the entire amount of the insurance provided for in the policy in any event. The judgment is reversed and cause remanded with directions to reform the "sub-standard" clause of the policy, so it will provide for a reduction in the amount to be paid under the policy, of 25%, in the event of death of insured within the first three

years after the policy was issued, and then to render such judgment in favor of appellee as she may be entitled to under the contract expressed, in the policy, as thus reformed, and under the facts of the case as existing at the time of the judgment.