C. D. POINDEXTER, *Administrator, Etc., v.* THE EQUITABLE LIFE ASSURANCE SOCIETY OF THE UNITED STATES

(No. 9659)

Submitted April 4, 1945.   Decided May 22, 1945.

672

*Vinson, Thompson, Meek & Scherr,* for appellant.
*P. H. Murphy* and *Scott & Ducker,* for appellee.

ROSE, JUDGE:

This is a suit by C. D. Poindexter, as administrator of William Robert Dabney, seeking reformation, in certain respects, of an insurance policy issued by the defendant on the life of Dabney, and an accounting to the plaintiff concerning all moneys received by defendant applicable to the policy, and the application of all funds so found in the hands of the defendant which are proper for that purpose, to the extension of the term of the policy after its lapse for nonpayment of premiums; and, if sufficient funds are found to keep the policy in force through the date of

the insured's death, to have a decretal judgment for its corrected face value.

No demurrer was interposed to the bill; an answer was filed which raised principally questions of law. Evidence was taken on behalf of the plaintiff and defendant. The court decreed a reformation of the policy in certain particulars, found the defendant in possession of certain funds which were directed to be applied to the purchase of an additional term of extended insurance, beyond that provided in the policy in case of lapse, decreed the policy to have been in force at the time of the insured's death, and entered a decretal judgment against the defendant for $9,070.89.

The application for the policy and receipt for the initial premium bear date November 17, 1911. The policy, issued under date of December 2, 1911, provided for the payment of $50.00 per month to the insured's wife, Kate V. Dabney, for twenty years after the insured's death and as much longer as she should live, and provided further that if the beneficiary should predecease the insured, the insured should have the right to name a new beneficiary, whose benefits should be limited to a monthly income of $50.00 for twenty years only, but that if no new beneficiary should survive the insured the policy should operate as an ordinary life policy payable to the personal representative of the insured in the amount of a commuted value of $9,194.40. The annual premium was $322.92, except that if the named beneficiary should predecease the insured the premium thereafter should be reduced to $303.48. At the time of the issuance of the policy, the insured was a resident of Ohio, but counsel appear to agree that the statutes and court decisions of that state do not differ from those of this state on any matter affecting this case.

The insured became insane sometime in the year 1912, and shortly thereafter was legally so adjudged and remained so until the time of his death. No committee or guardian, however, was ever appointed for him. After the insured became insane, the premiums on the policy, to and including that due November 17, 1921, were paid by the

beneficiary's brother. Failure to pay the premium due November 17, 1922, resulted in the lapse of the policy as of that date. The named beneficiary died January 18, 1918. No new beneficiary was named. The insured died May 15, 1936.

It is sought to reform the policy by making the commuted value thereof $9,070.89 instead of $9,194.40; and by determining the annual premium to be $318.87 instead of $322.92 during the life of the named beneficiary, and $299.43 instead of $303.48 after her death, with other changes necessarily resulting in the benefits arising upon lapse of the policy by reason of the nonpayment of premium.

The trial chancellor found that the policy should be reformed as prayed for and that there are in the hands of the defendant the following sums which are applicable to the purchase of an additional term of insurance: (1) The sum of $75.48, being the dividend to which the insured was entitled at the end of the last year for which the premium was paid; (2) the sum of $53.44, being the aggregate of eleven overpayments of $4.05, calculated from the reduction of the annual premiums by reformation of the policy in that respect, with three per cent compound interest to the time the policy lapsed; and (3) the sum of $98.70, being the aggregate of four excess payments of premium in the amount of $19.44 each after the death of the original beneficiary, and the excess payment of $1.68 per year during the beneficiary's lifetime by reason of the erroneous statement of her age in the policy, with like compound interest to the date of the lapse of the policy.

The defendant contends here that the trial chancellor erred as follows:

> "1. In finding that the excess premium paid, on account of the misstatement of the age of the beneficiary by the insured, for the policy years 1911 to 1917, inclusive, compounded at 3% interest annually, constitutes a credit by way of a trust fund and should be applied to the purchase of additional extended term insurance.

"2. In finding that the excess premiums paid for the policy years beginning November 17, 1918, 1919, 1920 and 1921—subsequent to the death of the beneficiary without notice or knowledge to the defendant—constitute a credit and as a part of the so-called trust fund to be applied to the purchase of additional extended term insurance.

"3. In reducing the face value or commuted value of the insurance from the sum of $9,194.40, as stated in the policy, to $9,070.89 and thereby creating the basis for application of the so-called trust fund credits for the purchase of additional extended term insurance in order to furnish a basis for extending the term insurance to a date beyond the death of the insured.

"4. In arbitrarily reducing the annual premium of the company for the Ordinary Life portion of the policy at the sum of $4.05 per annum, compounded at 3% annually, in the aggregate amount of $53.44, and in using that amount as a further trust fund credit for the purchase of extended term insurance.

"5. In disallowing the dividend apportioned for the policy year beginning November 17, 1922 (which the defendant applied to the purchase of paid up additional insurance), and thereby reducing the amount of the insurance and including the said dividend item in the so-called trust fund credit."

An insurance policy is subject to reformation in equity precisely as any other written instrument. *Bowman* v. *Hartford Fire Insurance Company,* 113 W. Va. 784, 169 S. E. 443; *Croft* v. *Hanover Fire Insurance Co.,* 40 W. Va. 508, 21 S. E. 854; *Thompson* v. *Phenix Insurance Company,* 136 U. S. 287, 10 S. Ct. 1019, 34 L. Ed. 408. This rule applies, of course, to life insurance policies. *McMaster* v. *New York Life Ins. Co.,* 78 Fed. 33; *Gray* v. *Supreme Lodge, K. H.,* 118 Ind. 293, 20 N. E. 833; *Pfiester* v. *Missouri State Life Ins. Co.,* 85 Kan. 97, 116 P. 245; *Central Life Ins. Co.* v. *Robinson,* 181 Ky. 507, 205 S. W. 589; *Pacific Mutual Life Insurance Co.* v. *Frank,* 44 Neb. 320, 62 N. W. 454; *Steinbach* v. *Prudential Ins. Co.,* 172 N. Y. 471, 65 N. E. 281; *Britton* v. *Metropolitan Life Ins. Co. of New York,* 165

N. C. 149, 80 S. E. 1072. And the grounds for, and the limitations which govern, the reformation of an insurance policy are exactly the same as for the reformation of any other instrument, such as accident, fraud or mutual mistake. *Hearne* v. *Marine Insurance Company*, 20 Wall. 488, 22 L. Ed. 395; *Salomon* v. *North British, etc. Insurance Co. of New York*, 215 N. Y. 214, 109 N. E. 121; *Insurance Co. of North America* v. *Cleveland*, 91 N. J. Eq. 371, 110 A. 582; *Hayes* v. *Penn Mut. Life Ins. Co.*, 222 Mass. 382, 111 N. E. 168; *Fidelity & Casualty Co. of New York* v. *Palmer*, 91 Conn. 410, 99 A. 1052.

We are unable to find in the record before us any substantial basis for the reformation of the policy in suit. It is agreed by the actuaries testifying on behalf of the plaintiff and defendant respectively that the mathematical equivalent of an income of $50.00 per month for twenty years, and as much longer as the beneficiary should live, is $9,070.89, and that the like equivalent of a yearly installment of $600.00, payable at the beginning of each year, for the same period, would be $9,194.40, which is the commuted value stated in the policy. Actually, of course, there is a difference to an insurance company between paying $50.00 at the beginning of each month during a year and paying $600.00 at the beginning of the year. The actuaries testify that this difference, in the present case, when carried into the premiums, without allowing for additional overhead expenses, would have been $4.05 per annum and would have resulted in a reduction of the annual premium from $322.92 to $318.87 while the named beneficiary lived; and, after her death, from $303.48 to $299.43, with a corresponding reduction of the commuted value of the policy from $9,194.40 to $9,070.89. But witnesses for the defendant clearly show, from the then used rate books, that the defendant made no distinction as to premiums on income policies between those providing for payment of an annual sum and those providing for payment in semi-annual, quarterly, or monthly installments of such sum. And none can dispute that if a true actuarial accounting is had consideration must be given to

the additional expense required for twelve disbursements per year, instead of one, embracing the cost of additional postage, stationery, and services of clerical employees, not only at the central office but at district offices. These are small items, but cannot be disregarded when an appeal for absolute actuarial accuracy is made. This overhead has not been shown in the record, and for this reason alone the reformation cannot be awarded. But aside from this no legal basis for reformation is shown—no accident, no fraud and no mutual mistake. No pretense of fraud is advanced in either pleading or proof, and no mistake, mutual or otherwise, is shown. The policy was written at the rate regularly adopted, promulgated, and used by the company in all such policies then being written. The premium is that for which the defendant offered to issue the policy. The insured, by his written application, offered to 'pay this requested premium. The policy, so written, was tendered to and accepted by the insured. These premiums he contracted to pay, and they were paid by him or on his behalf.

It must be kept in mind that we do not have here a strictly mutual insurance policy, but simply a "participating" policy, that is, one under which the insured, in addition to receiving certain definite specific benefits, is entitled to participate in further earnings or savings of the company. The extent to which the insured "participates" in these earnings and savings is exactly stated in the policy. The language is: "This policy shall participate annually in the distribution of the Surplus of the Society as ascertained and apportioned by it." This is the full extent of the insured's right to participate in the society's surplus— not in the absolute and mathematical surplus, but only the proportional part of the surplus which the society shall ascertain and allocate to the policy. The contract so says. The contract does not contemplate that the benefits shall be determined by going behind this limitation to ascertain the same upon a purely actuarial basis. Of course, if the society had acted fraudulently in making this allocation, a different question would arise, but we have no fraud

here. Even mutual insurance companies are not absolutely mutual. They cannot be. Their premiums, for instance, at best, are only estimates and approximations—estimates and approximations of high accuracy, it is true, but still only estimates and approximations. No company would write, and no insured would accept, a policy which was mutual in this absolute sense, thus requiring an accounting of the whole business of the company to determine the amount due the beneficiary. Few policyholders could undertake such an accounting, and courts have no facilities for making such accounting for them. To obviate this absurdity, policies with fixed premiums and clearly-stated benefits, and equally clear and limited participation in profits, are written. The contract thus reduced to writing will be enforced by the courts in the absence of accident, fraud or mutual mistake, none of which we have here.

The plaintiff also claims, by his amended bill, that the age of the beneficiary was misstated in the policy, in that she is therein represented to be forty years of age, whereas she was, in fact, forty-one, and evidence tending to support this allegation was introduced. The point is made that the life expectancy of the beneficiary is reduced by the increase in her age, thereby reducing the premium necessary to buy a policy giving her a monthly income for life. The evidence shows that by this correction as to the beneficiary's age the premiums in the present policy would have been reduced by $1.68 per year. The aggregate of these excess payments is claimed by the plaintiff to be used in extending the insurance term after lapse. But the policy itself defeats this claim. It is provided therein, as is usual in modern policies of insurance, that: "The Income due under this policy, if the age of either the Insured or the Beneficiary has been misstated, shall be for an amount which the premium charged would have purchased at the Society's rates in use at the register date hereof for their correct ages." This error, therefore, automatically resulted in an increase of the monthly income to the named beneficiary, and this increase absorbed the excess prem-

iums during the life of the beneficiary. According to the testimony of the actuaries, its actual face value to the beneficiary, by reason of her age, was not $50.00, but $50.26, with a like automatic increase in the commuted value.

At the end of the year beginning November 17, 1921, the defendant, in regular course, allotted to the policy in suit the sum of $75.48 by way of "dividend", a term the meaning of which is well understood in the business of mutual insurance. For practical purposes this "dividend" may be considered as that part of the premium paid for the current year which was unused, or not required, to carry the policy for that period. This sum the plaintiff claims to have been mandatorily applicable to the purchase of an extension of the term of insurance after its lapse. In this he is clearly correct. The policy expressly so provides. The language is:

> "In the event of default in the payment of any premium or instalment thereof after this policy has been in force three full years, if the Insured (or assignee if any) does not select one of said options within three months of such default, the insurance shall be continued as provided under Option (b)."

Option (b) is as follows:

> "(b) To continue the insurance for the Income as originally provided (and any outstanding dividend additions) as paid-up extended term insurance for the period shown in the above Table, or for such further period, as the dividend additions (if any) will purchase, but without future participation, or right to loans. The Income payable if this policy is thus extended is limited to twenty years, plus any additional Income provided by additional Reserve as explained below;".

The period shown in the table, upon default in the payment of a premium at the end of the eleventh year, is twelve years and six months. The "outstanding dividend addition" to the policy, as shown by the evidence, was such an amount of paid-up insurance as the said sum of $75.48 would buy at the insured's age at the time of default, or

$133.00, and this amount of paid-up insurance would, in turn, purchase an equivalent extension of term of the full face of the policy, after the expiration of the twelve years and six months stipulated in the table of options. Without circuity, this means precisely the additional term which $75.48 would have provided directly, and is what the plaintiff claims and what the court allowed.

The beneficiary, Kate V. Dabney, died January 18, 1918. This event automatically reduced the annual premium on the policy from $322.92 to $303.48, according to the express provision of the policy. The defendant, however, having no notice of her death, continued to send out notices, directed to the insured, for the original amount, and the beneficiary's brother, apparently not noticing the provision in the policy for reduction of the premium upon the death of the beneficiary, paid the annual premium of $322.92, which became due on the 17th day of November of the years 1918 to 1921, inclusive, there being, thus, an excess payment for each year of $19.44, or a total of $77.76. The plaintiff makes claim that this sum should also be treated as having bought a further extension of the term, while the defendant insists that the mistake created merely an ordinary debt and offers, by its answer, to pay the sum into court.

There is a general concurrence by the courts in the proposition that a policy of insurance must be construed liberally in favor of the insured. *Stroehmann* v. *Mutual L. Ins. Co.*, 300 U. S. 435, 81 L. Ed. 732, 57 S. Ct. 607; *Atlantic Life Insurance Co.* v. *Pharr*, 59 F. 2d 1024; *Home Beneficial Ass'n.* v. *Clark*, 152 Va. 715, 148 S. E. 811; *Mutual Life Insurance Co. of N. Y.* v. *Breland*, 117 Miss. 479, 78 So. 362; *MacDonald* v. *Metropolitan L. Ins. Co.*, 304 Pa. 213, 155 A. 491; *Pacific Mutual Life Ins. Co.* v. *Turlington*, 140 Va. 748, 125 S. E. 658. This rule arises, not from judicial sentimentality or benevolence, but from the practical fact that the instrument has been devised and written by the insurer after long experience, study and legal advice, while the policyholder has done little more than to sign on the dotted line. But no provision of the present policy covers

the situation and facts here presented. There is nothing for the Court to construe. The payment of these premium excesses was *dehors* the policy—beyond anything provided for or covered by the policy. The legal results of the payments, therefore, must be determined by general legal and equitable principles.

. In the ordinary case a payment by mutual mistake creates merely the relation of debtor and creditor. The money so paid may be recovered by the payor in an action for money had and received for his use. *Gardner* v. *Nichols*, 80 W. Va. 738, 93 S. E. 817; *Shinn* v. *Shinn*, 78 W. Va. 44, 88 S. E. 610. Cases are plentiful which hold that an insured who has paid an excess premium, or one not due, may recover the excess in a simple action at law. *Mutual Life Ins. Co. of New York* v. *Johnson*, 293 U. S. 540, 55 S. Ct. 86, 79 L. Ed. 646; *Equitable Life Assur. Soc.* v. *Mercantile Com. B. & T. Co.*, 143 F. 2d 397; *Hopkins* v. *Northwestern Nat. Life Ins. Co.*, 41 Wash. 592, 83 P. 1019; *Equitable Life Assur. Soc.* v. *Brame*, 112 Miss. 859, 73 So. 812; *Hartford Life Ins. Co.* v. *Douds*, 103 Oh. St. 398, 136 N. E. 274; *Still* v. *Equitable Life Assur. Soc. of United States*, 165 Tenn. 224, 54 S. W. (2d) 947; *Williams* v. *National Life & Accident Ins. Co.*, 222 Mo. App. 355, 1 S. W. 2d 1034; *Metropolitan Life Ins. Co.* v. *Bowser*, 20 Ind. App. 557, 50 N. E. 86; *McCoy* v. *New York Life Ins. Co.*, 219 Iowa 514, 258 N. W. 320. What element in this case takes it out of this rule? Neither the insured, nor the beneficiary, nor anyone for either of them, had any duty to make these excess payments, nor had the insurer any right to claim or to receive them. No provision of the policy, and no relation between the parties, created such right or duty. The payment and receipt of these excess sums was a purely mutual mistake, raising no blame against either party. Could the insured cast upon the insurer the duty to apply these excess sums to the purchase of additional insurance or an extension of the term of existing insurance? Or could the insurer, against the insured's will, compel him to accept additional insurance or an additional term, instead of the money mistakenly paid? The insured had the abso-

lute right to recover these excess payments from the instant they were paid, and the insurer the duty, equally absolute, to repay them. Thus stood their rights immediately after the payments. In what manner has time changed this situation? What wrong or negligence has the insurer committed? Both, in utter ignorance of the error, have remained in their original status. True, the insurer invested these funds, in regular course, to carry a risk which it supposed, excusably, to exist. This was no wrong or negligence. Upon discovery of the mistake, it stood precisely as it would have stood had the discovery been made immediately when the payments, respectively, were made. The insured's position has not changed to his detriment, except that he lost the use of his money, and he was equally the cause of the mistake. Certainly, upon discovery of the mistake, no right and duty arose in the insurer to use this money differently from the manner in which it might or should have been used if discovered promptly. Upon the late discovery of the error, that should be done which would have been proper at the time the error arose. Neither should profit or be penalized for that with which neither is chargeable, or for which both are equally to blame.

The plaintiff, further, would have us say that since the beneficiary died January 18, 1918, a portion of the premium for that year was unearned, amounting to $18.61, which must be used to purchase a further term for which the policy is to be carried at its face value. This claim we cannot allow. In case of an ordinary life policy, death within a year for which a premium has been paid does not entitle the beneficiary to be rebated for the part of the premium covering the balance of the year. We see no reason why the same rule should not apply to the death of the beneficiary, by reason of which the premium is reduced. Moreover, the express provision of the policy is that: "If the Beneficiary should die during the lifetime of the Insured, * * * any premiums payable thereafter will be reduced to Three hundred three and 48/100 Dollars * * *". Thus the death of the beneficiary

only operated to reduce subsequently-accruing premiums.

Considerable evidence and argument are devoted to the question of the amount of the commuted value of the policy, or its face value after the death of the named beneficiary, and failure to name another. We have declined to modify the amount written in the policy. For the purpose of the questions involved in this suit this amount is wholly immaterial. Whatever this amount may be, it will be carried for exactly the same time by its pro rata share of the company's reserve. The larger the face of the policy, the larger will be its share of reserve, and vice versa. The policy so advises the holder. It says: "The term for which extended insurance will be granted remains the same, without regard to the amount of the income". The "income" referred to is obviously the monthly payment of $50.00, since the amount which, by the policy contract, the defendant is to pay to the named beneficiary, is "A Monthly INCOME OF—FIFTY DOLLARS". This unchanging term of extension is a mathematical result regardless of any provision of the policy. The amount of insurance after the death of the named beneficiary, in case no other is named, is the commuted value and would be important only if a recovery is decreed, and for determining the additional term for which the policy will be carried by the "dividend additions". The larger sum of $9,194.40 could not be carried as long as the lesser sum of $9,070.89 by these sums which are additional to the normal reserve, and, of course, if recovery were finally achieved it must vary according to the amount of the face of the policy or its "commuted value".

The question of the effect of the insured's insanity is discussed by counsel, but it must appear that in view of the conclusions at which we have arrived, this factor cannot be controlling in the case. We have allowed in full the plaintiff's claim, based on the dividend of $75.48, and the insured's insanity cannot warrant any further relief emanating from this item; and we have, upon grounds which the insured's incapacity cannot alter, disallowed all relief claimed by the plaintiff upon the other items in-

volved. We are, therefore, unable to perceive how the insured's insanity can be further considered for any purpose in the case.

The trial chancellor correctly found that the additional sums which he determined to be chargeable to the defendant, if used to buy an extended term, would have kept the policy alive until after the insured's death. But in accord with the conclusions above announced, the chancellor was clearly correct as to the existence and application of the sum of $75.48; but in error as to the availability of the other sums, and each part thereof, for the purpose to which they were decreed. It is obvious that the sum of $75.48 alone is not sufficient to prolong the term of extended insurance to May, 1936, when the insured died. The policy lapsed November 17, 1922, which was at the end of its eleventh year. By the express terms of the policy, where, by reason of nonpayment of premium, the lapse occurred at the end of the eleventh year, and no other option is chosen by the insured, the insurance in the amount of the face value of the policy is automatically extended for a period of twelve years and six months from the date of lapse, or to May 17, 1935. The policy is so carried by its cash surrender value of $1,800.00, or at a cost of $144.00 per year. To carry the policy from this date to May 15, 1936, the date of the insured's death, will necessarily require more than $75.48.

But the defendant, by reason of the mutual mistake of the payor and insurer, does have in its hands, as found by the accounting, the four sums of $19.44 each, paid to it on behalf of the insured, in excess of premiums due after the death of the original beneficiary. For these sums it is liable to the plaintiff. However, the sums were not knowingly or wilfully or negligently withheld by the company, and, therefore, we think the defendant ought not to be mulcted with statutory interest thereon, but, on the other hand, the insurer should not profit by the common error. It is conceded that these sums were so invested by the insurer as to realize, over and above all overhead and expenses, a net profit from them equal to three per cent

compound interest. These sums, together with this usufruct or increase, should be paid to the plaintiff, and a decree should be entered accordingly.

It follows that the Circuit Court of Cabell County must be reversed, which is accordingly done, and the cause remanded for the entry of a decree in accordance with this opinion.

*Reversed and remanded.*